Thank you. Good morning. May it please the Court. I am Brian Boydston on behalf of the Appellant Worldwide Subsidy Group. We have here a case which is not a federal question. It's a good old-fashioned common law, state law, state law, common law issue on contract formation. And what it really boils down to is did FIFA, the appellee here, accept the agreement that was proffered by the appellant? And essentially we focus in on three pieces of correspondence. There's other evidence in the record. There's other communications. But it really comes down to three pieces of correspondence. The first was in March of 2001 in which, after communication between the parties, Worldwide Subsidy Group proffered a proposed contract that was somewhat detailed. Changes had been made to it and were referenced in the cover letter. The contract wasn't executed. The parties had communications after that, but there wasn't an execution. And the way this business works is there's a July 31st deadline every year that has implications. As a result, in July, July 22nd, 2001, Worldwide Subsidy Group sent another fax. It was a letter, but it was faxed, saying, with regard to the agreement that we put together here, we haven't had anything executed yet. We need direction on what we're going to do because there's a deadline coming up. It says we have made all the program registrations we have discussed with you. Correct. Discussed. Yes. Uh-huh. And then on July 31st, 2001, FIFA responded, saying, yes, we would like to test your services. Actually, first, and it's important to us, that first, in the July 31st response, e-mail response from FIFA, it said, put it in context by saying, with regard to your letter of July 22nd, we wish to test your services. So is it the July 22nd fax that says a very significant reoccurring deadline is coming up and we need to hear back from you? Yes, Your Honor. Okay. I mean, that's not the exact wording, but essentially, yes. Well, I can give you the exact. A very significant reoccurring deadline occurs on July 31 for U.S. royalties. That language, it goes on, but I don't want to take up your time. But that came in July 22nd. So your theory is that they were on notice that, right, to protect these rights, we need to hear back from you by that date, and did, right? Yeah. I mean, the statement is somewhat equivocal in that they're saying, at some point, we're going to have to provide things to different agencies. Now, in fact, what happens on the 31st, you don't have to turn over a signed agreement from FIFA on the 31st. But Worldwide Substitute had to make filings with the Copyright Office on that day, and it preferred to do it with a signed contract in its back pocket, even though it didn't have to produce that contract at that time. It preferred to do it, you know, with a signed contract in its back pocket. It didn't get one, but it got the next best thing, which was this e-mail on the 31st saying, please take all necessary steps to go forward. And, again, the e-mail on the 31st, first it says, with regard to your July 22nd letter. Can I have you back up a little bit before you move on to the July 31st? Yes. I'm going back to July 22nd communication. It says, we still need to receive executed originals of the contracts previously forwarded to your attention. Now, I understand what you say, given the timing and the urgency of it, that they were moving forward without it. But is there any indication in the record that executed originals were eventually received? No, Your Honor. We do not we are not aware of whether they exist or not. We suspect they may exist, but Worldwide Subsidy Group does not have them. We also haven't been able to do discovery to ask FIFA. FIFA has never said that they do not exist. We don't have them, though. And there was a footnote in our briefs that explained the reason why. There was a dispute amongst ownership at the time that these might have been returned to Worldwide Subsidy Group, Worldwide Subsidy Group was being run by a former partner who then. Right. Some documents went missing. Exactly. There's no linkage beyond that, that these originals might have been in that set of missing files. It is possible. But the straight answer is. There's also, is this fundamentally a statute of frauds problem or a meeting of the minds? Was there ever an agreement problem? There's no evidence precisely of an oral agreement. Right. Everything we're dealing with are these pieces of paper. At the same time, they said we're going to proceed in reliance on the terms, and they said please go ahead. So the question isn't really the terms, which is what often the concern is with a statute of frauds. The real question is was there ever an agreement? I think that's right. The first and most important question, an ultimate question is, is there an agreement? If there is an agreement, then within the representation agreement that was provided and negotiated, there is a form selection clause which the district court said if that's effective, then there's jurisdiction, then we move along with everything else. But because it's dependent, the district court said it's dependent upon whether or not there is an agreement. You're right, Your Honor. What we're looking at here is do we have an agreement? Right. What's the strongest evidence that you do? Because even for a substitute theory like promissory estoppel, you have to have a promise. So what's the strongest evidence that there was an agreement here? In the July 31st e-mail responding. And, again, I have to always say this, the July 31st e-mail in the context of referencing and incorporating the July 22nd facts, which references the March 2001 facts where FIFA says FIFA is interested in testing the services of Worldwide Subsidy Group and administration of retransmission royalties. Here's the most important part. Here's what you're asking for. Please go ahead with the necessary steps. Well, it seems to me, I know we just are endlessly interrupting you, but could you back up one step? Because you skipped this. In the July 22nd, it said not just a very significant reoccurring deadline, but it also said until we receive such originals or comments, we will proceed in reliance on the terms set forth previously. And then you get to please go ahead. Right? Well, I mean, yes, of course, the July 22nd letter. Now, the thing is the July 22nd letter, yes, they're saying we're going to proceed on those terms. You're right. And perhaps that's enough. But I guess, to my mind, what locks it down is when we have a statement from the other side, FIFA, saying, yes, please take all necessary steps. Well, that's what I mean. That's the context. And they say, please. Okay. But so when he gets up, he's going to say that you skipped again. The please go ahead part certainly cuts in favor of your team. But it says FIFA is interested in testing. Yes. That's equivocal language. Well, and clearly that's what drew the attention of the district court, the verb testing. Okay. And then the question is, well, testing, what does that mean? And I guess our point is that is cleared up by please go ahead and take the necessary steps. What else would it possibly? They were already told that essentially it couldn't go ahead without a contract. No, not necessarily, Your Honor. I understand why you might draw that inference. But here's the thing, is that in the July 22nd facts, Worldwide Substitute Group was saying we need to get the executed contract because at some point someone's going to ask us for it. Different agencies may ask it. But we are going ahead anyway to make these filings so that we don't blow the July 31st deadline. Because if they didn't make those filings with the U.S. Copyright Office, they would have been forfeit for FIFA. So, I mean, in actuality, there was a contract. But the reference to testing the services suggested, I mean, the only way you could think that that cuts against there being a contract is the notion that they could have gone ahead and tried it out without there being a contract. And they had been told earlier that essentially you can't do that because you're not going to be able to actually, in the end, accomplish this unless there's a contract. In effect, they're saying, I mean, yes. I think in effect, yes, that is what they're saying. They're saying we're going to need an executed contract at some point. The fact of the matter is different agencies that distribute these royalties have different rules on those things. And frankly, the U.S. Copyright Office does not, as a bright line rule, insist upon a written agreement between a party of the FIFA issues and Worldwide Subsidy Group. So, I don't want to mislead anyone here in that regard. But what Worldwide Subsidy Group was doing was trying to get the signed agreement in case it needed to produce one. Right. And I think that's clear from your briefing. But I have another question about please go ahead with the necessary steps. Because it seems to me if you glom those two sentences together, we're interested in testing your services. And that's juxtaposed right next to please go ahead with the necessary steps. The necessary steps might mean, hey, please go preserve our rights for us. You know, undertake these filings. But it might mean we're interested in testing. Go ahead with, you know, send us something that will be a, not the contract we've got, because otherwise we would sign it and send it back to you. But send us something that would memorialize an agreement to test a trial period. But they didn't, there's nothing in here that says those words that you just said. Well, it says please go ahead with the necessary steps. And I'm trying to figure out what the necessary steps are. Your position is that the necessary steps are please go forth and preserve our rights for us. Well, not just preserve, but pursue them. Yeah, you're right. Do what you're supposed to do under the agreement. Yes. But it might be that the necessary steps had to refer back to this preceding sentence about we're interested in testing your services. How would anyone reading this know that, though? How would Worldwide Subsidy Group know that this is not? Also, it goes on and says keep us informed about the proceedings and the outcome. Right. So the contemplation was to go to the end, not simply. Yeah, the outcome, right. Correct. Correct, Your Honor. That's exactly right. I couldn't make the point better myself. Well, then maybe you should make it again, because you've lost me. If you would, please. And I'm not trying to give you a hard time, but I'm looking at the entirety of the July 31 email. We refer to your facts on July 22nd. Right? FIFA is interested in testing the services. Please go ahead with the necessary steps and keep us informed about the proceedings and the outcome. Yeah. As Justice Berzon was just saying, the last phrase of that last sentence there implies that they're asking Worldwide Subsidy Group to go through the thing in its entirety because they're asking to be informed about the proceedings and the outcome. The outcome would be the end of the process. So that's the part I do understand. That's the part I do understand. Okay? But I'm trying to read it in conjunction with this word, testing. And it just strikes me that testing is a tough word for your team. So what's your strongest argument that testing doesn't demonstrate a sort of equivocal nature to this response? It's not in isolation. There is the rest of the response. There is the next sentence that says, please go ahead. Counsel, we've talked about and we've talked a lot about these two particular emails. If we find that it's ambiguous as to whether these two emails alone, even viewed in the context, is not enough to show mutual assent, then what do we do at that point? What evidence do you want us to look at? Well, there's the fact that Worldwide Subsidy Group said that we are going to go forward on the July 22nd letter. It was not an email. It was a letter. They're saying there we are going to go ahead in reliance upon the terms that were in the agreement we sent to you in March of 2001. And they're acting in reliance upon that. And at no point does FIFA say, no, don't go forward. No, don't rely. Do we look at the extrinsic evidence in the record, the course of conduct that WSG engaged in, the 40-plus filings, the communications? Yes, all that. That was my question. If you look at the July 22 facts and the July 31 email and you say, well, I'm not sure that these two documents really demonstrate mutual assent because we're not clear on what the terms are. Maybe one way to look at it is that FIFA had some uncertainty about whether they were going to go ahead and enter into this agreement, whereas WSG thought that the agreement was reached. What do we do at that point? Do we then look at the whole history of the conduct between the parties to determine what they intended?  I mean, it's in the record. And you can see that after this time period in 2001, WSG continued to provide correspondence. FIFA made the argument, oh, they never told us anything. That's not the case. And we made that clear in the record. I don't need to belabor that. There are clearly, after that correspondence sent by WSG to FIFA in 2007, at one point they say, oh, you know, proceedings now, it looks like they're going to start. As it turned out, they didn't. But they kept them apprised of what was going on. The proceedings themselves didn't get going until 2012, which is when this lawsuit arose because FIFA said, we don't want you doing this. But, Your Honor, Justice Christin, back to your point, and we made this point in the opening brief. Imagine the tables were turned and Roy's substitute group did nothing here, sat on its hands. It would be pretty tough for me to defend. I like that argument a lot better. I think that's a much better argument, just saying. Okay. Could you – what about the July 22 facts? We have made all the program registrations we've discussed with you. What about the discussions? Is any part of your argument premised on the discussions? I'm sorry, the last part. Sorry. Is any part of your argument premised on the notion that there were other discussions? Well, I mean, we have certainly – there were other discussions. They're not documented like, you know, these exhibits are, of course. But, yes, in the Declaration of Raul Galaz, which was filed in the record, he describes the discussions the parties had. And what those discussions were were essentially, okay, what is your programming? Well, we have this. Okay. When was it put on? Okay. Have you assigned it to anyone else? No. All right. Here's how it works. We can file claims with the United States Copyright Office. We can file claims in Australia. We can file claims in Europe, et cetera, et cetera, et cetera. And those were the nature of the – that it was – and the agreement itself, the March agreement, it describes a bunch of those sorts of things about what it is that Worldwide Subsidy Group will do and what FIFA will do in terms of providing it with the information so that Worldwide Subsidy Group can go out and collect this money. I mean, one of the enduring ironies of this whole thing is that all Worldwide Subsidy Group is trying to do is get these people money. And because Raul Galaz had a criminal background, they freaked out and said, we'd rather take no money than work with you. Is the – are the declarations, the discussions, such as the evidence that we have of the discussions, is that part of the extrinsic evidence that ought to be considered? Yes, Your Honor. That wasn't a trick question. I just tried to bring that to a close. Thank you. Counsel will hear from opposing counsel. Your Honor, given the questions, may I have a minute or two? Yes. We'll put two minutes on the clock when you come back. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. My name is Margaret Dale, and I represent FIFA, the appellee. Your Honors, the July 31 email from FIFA does not demonstrate FIFA's clear or unequivocal acceptance of the representation agreement, which is the document that we're talking about, which WSG says was sent over to FIFA in March of 2001. We have three papers. Does it – just a minute. Does it clearly demonstrate that they want – that they agree to have representation? Yes. I don't think so. I think testing your services is ambiguous as to what that means. There were discussions apparently before between some period of July 22 facts and July 31 email. The relines on both the July 22 facts and the July 31 email are different. But the services was representation, and it says, please go ahead with the necessary steps and keep us informed about the proceedings and the outcome. So there doesn't seem to be any doubt that they were agreeing to have representation. Perhaps, Your Honor. But what we're talking about is whether FIFA can be sued in California under the representation agreement. I understand that. I was just trying to go in steps, all right? So your argument isn't that they didn't in some respect have a meaning of the mind to the fact that they were going to be represented by this group before the copyright board? Yes, I am. I'm not going to – I'm not conceding that, Your Honor. Because retransmission royalties, there are – there are retransmission royalty proceedings throughout the globe. And in fact, the March – the March agreement references worldwide representation. And I know that the July 22 facts references a deadline in the United States. But I don't think that we should be here reading into these few pieces of paper we have and filling in the gaps of what exactly was meant by we're interested in testing your services for the – so please go ahead and take necessary steps. I think Judge Christian said, well, couldn't they be saying send us something that is more on a test basis? Again, I don't think it's our burden to fill in the gaps here. There is not – there is not mutual assent here. There is not an unequivocal – To respond to the opposing counsel's argument, because I think it's a powerful one, what if the roles were reversed and they hadn't gone forward to protect FIFA's rights? And then FIFA was relying on these three same pieces of paper? He said, yeah, we told you to go forward and protect our rights. I mean, that doesn't seem to be awfully clear to me. So what's your response to that, please? My response to that is it says keep us informed about the proceedings and the outcome. And there are absolutely no substantive communications between that point in time. So if they hadn't done anything, they could say, well, we didn't keep you informed and therefore you didn't know that we weren't performing. I mean, when the shoe is on the other foot for the equitable estoppel claim, we didn't know. We had no idea what they were doing for 12 years. Well, but I think your argument would be a little stronger if it weren't for the fact that the July 31 e-mail specifically references the July 22 facts. So I think we have to start with the July 22 facts because that's what FIFA was specifically referencing. And when you go back to the July 22 facts, it says, you know, we had prior discussions with you about our services. We have we sent you the contracts, right, get us the original back. But there's a deadline coming. And so until we receive the original, we're going to go ahead and proceed to protect your interests based on the terms of the contract that we sent you. And then very next communication, all right, we're going to talk about your facts that you sent to us. Please go ahead with the necessary steps. So those two together seem to indicate to me that FIFA was referencing go ahead with the registration to protect our interests. Go ahead and represent us. It's a fair interpretation of those two communications together, isn't it? I think you could argue that it is a fair representation of those two communications, but I don't think it goes back to the March 2001 representation agreement. I don't think you can read these two documents in July and say they were talking about the unsigned and my adversary has conceded that there is no signed agreement anywhere. He did not concede that, counsel. He said he can't find it. He hasn't produced it. He was quite clear in not conceding. Apologies. Well, it's important to be clear. Yeah, no, that is important. But we don't have one either. Anyway, getting back to your point, yes, so it hasn't been produced. We don't know if it exists. But getting back to Judge Wynn's question about the prior agreement. Yeah. I said I think that those two July, that correspondence seems to indicate that FIFA is interested in testing their services relating to the retransmission proceedings. But I don't think that you can say that that is language that, therefore, is acceptance, a mutual acceptance of the terms of the March 2001 representation agreement. So, counsel, to just stop there, if that, I mean, I understand your point because it doesn't say we accept, right? We have to do some reading in. But what do I make, then, of this? Please go ahead with the necessary steps and keep us informed. Please go ahead. Right. Go ahead in terms of testing. We want to test your services. So it seems to be indicating to go ahead with certain of the program registrations. Yes. But what they were told is until what the July 22nd letter said is until we receive such original comments thereto, we will proceed in reliance on the terms set forth in the previously forwarded contract. They weren't given an option of going ahead on some other basis. Your Honor, it says previously forwarded contracts in plural. And we, the entirety of my adversary's argument is based on the fact that these contracts are actually one contract, the representation agreement that was sent in March of 2001. So let's say that we read the necessary steps. And it's unclear as to whether necessary steps to keep us informed refers to testing of services or necessary steps pursuant to the contract that's referenced in the earlier facts. Do we then look at the extrinsic evidence? I'll ask you the same question that I asked opposing counsel. Do we look at the fact that there was, in fact, representation and all of these filings were done on FIFA's behalf, and FIFA was informed and kept apprised of that? Your Honor, first of all, whether there's mutual assent, whether that exists, is an objective standard based on what a reasonable person would believe. And it's not reasonable in our view to infer that FIFA agreed to a contract of this many years' duration by an e-mail that made no reference to that agreement and that supposedly documented whatever deal was in place and contained language with the testing of services that's inconsistent with a deal that would bind FIFA for more than a decade. But there is also, Your Honor... But wait a minute. The agreement was feasible. That is, it specifically said that it could be canceled after three years. The fact is they didn't cancel it, but it wasn't a contract that bound them for 10 years. So that seems consistent with the testing notion, too. We'll try it for the term that you say, three years. And then we don't need to do it anymore because it wasn't a permanent commitment. But I just disagree with that logic. I think that there needs to be more clarity about what the terms of the agreement were. And I go back to this period of time between March and July when we are all potentially assuming that the only contract at issue that we're discussing is an unsigned March 2001 agreement, when the language of the later correspondence also references multiple contracts. And I think that is further ambiguity. Your Honor, about your... I didn't answer your question, Judge, about the extrinsic evidence. Mr. Golaz's affidavit or declaration in support of this, in support of his client's position, is at the record, it's pages 336, and the declaration ends at 340. And there is not discussion in this declaration about, you know, conversations that were had over time between FIFA and WSG, Mr. Golaz. But there were a series of letters... I just read it again. There were a series of letters said, Dear Client, changing contact information, updating on what was going on with the proceedings and so on. I understand it didn't say, Dear so-and-so, but it had an address of the FIFA people. They had an address for FIFA, Your Honor, the four... And then they wrote a letter, Dear Client, and they went on. They're form letters. They were sent to all of WSG's clients. And there were still letters that were received by FIFA that said, Dear... that had their name on it and said, Dear Client. They did, but they do not have any... They just do not talk about how the proceedings are going. They talk about changing contact information. Again, there are... It's just a very generic and vague statement in a form notice about a change of contract information. None of them specifically identify FIFA as a client. None of them indicate what filings had already been made, follow-up on the request for an executed contract, or address royalties that might be sought from sources other than the United States Copyright Office. As the district court found below, FIFA therefore, quote, would have had no adequate means of learning of WSG's performance with reasonable promptness and certainty. The lack of any communication direct by WSG to FIFA, keeping FIFA informed of developments for over 10 years, following this July 31, 2001, email, we think further demonstrates the implausibility and unreasonableness of this asserted contract. If Your Honors don't have any other questions, I would stand on the rest of my brief. Anything further, Judge Berzon? No? Thank you, counsel. Appreciate your argument. Thank you. Counsel, we'll put two minutes on the clock for you, because we asked you so many questions. Go right ahead. Just a couple quick points based on what just came up there. First, let me remind the court that the district court had no problem with the issue of whether or not the July communications were talking about the terms in the contract way back in March. The district court's problem was the one we've been talking about mostly here, which is, were the July communications... Did the July communications constitute an acceptance? Should they be legally held to constitute an acceptance? So just bear that in mind. The first round here, there was no question about, oh, yeah, okay, these clearly are talking about the March agreement. If there is an acceptance here, the district court had no problem saying, yes, the terms of the March agreement hold, and basically said, and if they hold, there's a jurisdictional clause. The other thing, just very quickly, about this reference to contracts plural in the July 22nd, that's because there's a contract and there's a form. Now, when the person who wrote this wrote it, they said contracts plural because there's two separate pieces of paper. There's, like, a two-page form, which is the first thing in that exhibit, and then there's the contract, which is about five pages. That's the reason for the plurality, in case there's any confusion. I don't think it's really amounts to anything, but that's the reason why the word contracts plural was used. And as for Mr. Glaz's declaration, he does explain, again, I think it's clear from the record, he does explain that there were communications. Some of them were form letters in the sense they were sent to everybody, but others were not, and they were all specifically addressed to FIFA. And during that time period, there was actually really nothing to report because the proceedings weren't going on. I'm going out pretty soon to Washington to go do some of these same years because they're still at issue. You can imagine how much fun that is. This is a process that just gets delayed. In sum, if the court says that this exchange of communications doesn't make a deal, in the real world, people are going to go nuts, saying, well, wait a minute, if this doesn't constitute a deal, then when do I know if I've got a deal or not? And I think the court realizes that. Well, I suppose the short answer is when you have a signed piece of paper. I beg your pardon? The short answer is when you get a signed piece of paper. Well, yeah, and unfortunately, the way the world works is, you know, laypeople just don't always get to that, even sophisticated laypeople, and frankly, a lot of people in entertainment. Thank you, counsel. Thank you. Thank you both for your argument. The next case on the calendar is 14-60079.
judges: Berzon, Christen, Nguyen